1  Theodore Hoppe, #138064
**HOPPE LAW GROUP**
2  680 W. Shaw Avenue, Suite 207
3  Fresno, CA 93704
Telephone: (559) 241-7070
4  Facsimile:  (559) 241-7212
tad@hoppe-law.com
5

6  *Attorneys for Plaintiff, Atlantic Specialty Insurance Company*

7

8  **UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
9  **FRESNO DIVISION**

10

11  ATLANTIC SPECIALTY INSURANCE )
COMPANY,                      )
12                                )  Case No. 19-928
                                )
13              Plaintiff,        )
                                )  **COMPLAINT FOR DECLARATORY**
14  v.                            )  **JUDGMENT**
                                )
15  FIRSTCHOICE MEDICAL GROUP, INC., )
DR. MANTHANI REDDY, DR. KIRAN )
16  REDDY, DR. CHINNAPA NAREDDY,  )
DR. JOSE-LUIS BAUTISTA, DR. PAM )
17  JANDA, DR. TARLOCHAN TAGORE,  )
DR. MADHAVA NARALA, DR.        )
18  AJIT KHAIRA and SMARTMED, INC. )
19  d/b/a MEDSMART CONSULTING     )
                                )
20              Defendants.       )
                                )
21  _____)

22       **COMPLAINT FOR DECLARATORY JUDGMENT**

23       Plaintiff, ATLANTIC SPECIALTY INSURANCE COMPANY ("Atlantic"), by and through

24  its attorneys, Hoppe Law Group and Karbal, Cohen, Economou, Silk & Dunne, LLC, for its Complaint

25  for Declaratory Judgment against Defendants, FIRSTCHOICE MEDICAL GROUP, INC.

26  ("FirstChoice"), DR. MANTHANI REDDY ("M. Reddy"), DR. KIRAN REDDY ("K. Reddy"), DR.

27  CHINNAPA NAREDDY ("Nareddy"), DR. JOSE-LUIS BAUTISTA ("Bautista"), DR. PAM JANDA

28  ("Janda"), DR. TARLOCHAN TAGORE ("Tagore"), DR. MADHAVA NARALA ("Narala"), DR.

AJIT KHAIRA ("Khaira") (collectively, the "FirstChoice Defendants"), and SmartMed, Inc. d/b/a MedSmart Consulting ("SmartMed"). In support of its Complaint, Atlantic hereby states and alleges as follows:

## NATURE OF THE ACTION

1.      In this action, Atlantic, which has provided a defense under a reservation of rights to the FirstChoice Defendants, seeks a declaration from this Court, pursuant to 28 U.S.C. § 2201-2202 and Fed. R. Civ. P. 57, that Atlantic owes no obligations to any of the Defendants under two claims-made Healthcare Organization Management Liability policies issued to FirstChoice Medical Group, Inc. with respect to a $2,224,105.27 underlying arbitration award/judgment entered against FirstChoice and the subsequent lawsuit to collect the judgment.

2.      Specifically, Atlantic seeks a declaration that: a) it has no obligation to defend or indemnify the FirstChoice Defendants with respect to the arbitration award and subsequent underlying lawsuit because the lawsuit relates to, arises out of and is the result of an arbitration that was a claim first made prior to the inception of either of the Atlantic policies; and b) as a result, Atlantic can stop defending the FirstChoice Defendants and is entitled to recoup the monies it has paid for the defense of the FirstChoice Defendants from them jointly and severally.

## THE PARTIES

3.      Plaintiff Atlantic is a New York corporation with its principal place of business located in Minnesota.

4.      Defendant FirstChoice is a California professional medical corporation with its principal place of business in Fresno, California.

5.      Defendant M. Reddy is an individual domiciled in California and residing in the County of Fresno.

6.      Defendant K. Reddy is an individual domiciled in California and residing in the County of Fresno.

7.      Defendant Nareddy is an individual domiciled in California and residing in the County of Fresno.

///

1    8.    Defendant Bautista is an individual domiciled in California residing in the County of

2 Fresno.

3    9.    Defendant Janda is an individual domiciled in California and residing in the County of

4 Fresno.

5    10.    Defendant Tagore is an individual domiciled in California and residing in the County

6 of Fresno.

7    11.    Defendant Narala is an individual domiciled in California and residing in the County

8 of Fresno.

9    12.    Defendant Khaira is an individual domiciled in California and residing in the County

10 of Fresno.

11    13.    Defendant SmartMed is a California corporation with its principal place of business

12 located in Camarillo, California.  SmartMed is named as a defendant herein solely as a potentially

13 necessary party and Plaintiff will dismiss SmartMed in the event it stipulates to be bound to the final

14 judgment in this lawsuit.

15                              **JURISDICTION AND VENUE**

16    14.    Jurisdiction is proper in this Court, pursuant to 28 U.S.C. § 1332(a)(1), because the

17 Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds

18 $75,000, exclusive of interest and costs.

19    15.    Venue is proper in this District, pursuant to 28 U.S.C. § 1391(1), because Defendant

20 FirstChoice is located in this judicial district and the events giving rise to FirstChoice's claim for

21 coverage to Atlantic occurred here.

22    16.    The Court has personal jurisdiction over Defendant FirstChoice because the Defendant

23 is incorporated under the laws of the State of California and is a corporation doing business in the State

24 of California.

25    17.    The Court has personal jurisdiction over all of the individual Defendants because they

26 are California citizens and reside in Fresno, California.

27 ///

28 ///

**THE 2015-2016 POLICY**

18.     Atlantic initially issued a claims made policy, No. MCM-00885-15, to FirstChoice with a January 1, 2015 to January 1, 2016 **Policy Period** (the "2015 Policy").  The 2015 Policy contains a D&O Coverage Section, which states a limit of liability of $1,000,000 each **Claim** and in the aggregate.  (A copy of the 2015 Policy is attached hereto and incorporated herein at Exhibit 1.)[1]

19.     The 2015 Policy is subject to all of its respective terms, conditions, limitations and exclusions and states as follows at **Directors, Officers & Organization Liability Coverage Section** ("D&O Coverage Section"):

> In consideration of payment of the premium and subject to the Declarations, the General Terms and Conditions, and the terms, conditions and limitations of this Coverage Section, the Underwriter and the **Insureds** agree as follows:
>
> **I.      INSURING AGREEMENTS**
>
>        * * *
>
>     (C)     **Organization Liability Coverage:**
>
> > The Underwriter will pay, on behalf of the **Organization, Loss** from any **Claim** first made against the **Organization** during the **Policy Period** or applicable Extended Reporting Period for a **Wrongful Act**; provided, that such **Claim** is reported to the Underwriter in accordance with Section VIII of this Coverage Section.
>
>                *      *      *

20.     The D&O Coverage Section of the 2015 Policy contains the following relevant definitions:

> **II.     DEFINITIONS**
>
>        * * *
>
>     (B)     **"Claim"** means:

///

---

[1] Certain terms appearing in bold text are bolded and defined in the Atlantic policies.

COMPLAINT FOR DECLARATORY JUDGMENT

(1)     a written demand for monetary, non-monetary or injunctive relief (including any request to toll or waive any statute of limitations); or

(2)     a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief commenced by:

    (a)     the service of a complaint or similar pleading;

    (b)     the return of an indictment, information or similar document (in the case of a criminal proceeding); or

    (c)     the filing of a notice of charges, formal investigative order or similar document,

against an **Insured** for a **Wrongful Act**; provided, that **Claim** does not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement.

\* \* \*

(L)     **Loss**[1] means **Defense Expenses** and any monetary amount which an **Insured** is legally obligated to pay as a result of a covered **Claim**, including but not limited to:

(1)     monetary damages (including punitive or exemplary damages or the multiple portion of any multiplied damage award, to the extent such damages are insurable under the law of any jurisdiction which has a substantial relationship to the **Insureds,** this Policy or the **Claim** giving rise to such damages and which is most favorable to the insurability of such damages);

(2)     judgments;

---

[1]  As amended by Endorsement No. MPE-13035-09-09.

COMPLAINT FOR DECLARATORY JUDGMENT

(3)     settlements;

(4)     pre- and post-judgment interest;

(5)     **Excess Benefit Transaction Excise Taxes** that an **Insured Person** is obligated to pay as a result of a **Claim**; provided that **Loss** shall not include the twenty-five percent (25%) excise tax assessed against any **Disqualified Person** or the 200% tax assessed for failure to correct an **Excess Benefit Transaction**; and

(6)     civil fines and penalties levied against an **Insured**:

    (a)     for an **Internal Revenue Code Violation**;

    (b)     for violation of the Emergency Medical Treatment and Active Labor Act, as amended ("EMTALA");

    (c)     for violation of Title II of the Health Insurance Portability and Accountability Act of 1996; or

    (d)     for **Regulatory Wrongful Acts**.

**Loss** does not include:

(i)     any amount not insurable under the law pursuant to which this Coverage Section is construed, except as provided in paragraph (1) above with respect to punitive or exemplary damages or the multiple portion of any multiplied damage award;

(ii)    civil or criminal fines or penalties, except as provided in paragraph (1) above with respect to punitive or exemplary damages or the multiple portion of any multiplied damage award and as provided in paragraph (6) above with respect to the specified civil fines and penalties;

(iii)   taxes or tax penalties (whether imposed by a federal, state, local or other governmental authority), except as provided in paragraph (5) above with respect to any **Excess Benefit Transaction Excise Tax**;

(iv)    any costs incurred by the **Organization** to comply with any order for injunctive or other non-monetary relief, or to comply with an agreement to provide such relief; or

(v)   any fees, profits, or other revenue lost, or any costs incurred, by an **Insured** in connection with the termination, suspension or limitation of such **Insured's** right to participate in any program of a federal, state or local governmental, regulatory or administrative agency.

(M)   **"Managed Care Activities"** means any of the following services or activities, whether provided on paper, in person, electronically, or in any other form and whether performed for or on behalf of the **Organization** or by the **Organization** for itself or on behalf of any other party for a fee: **Provider Selection**; **Utilization Review**; advertising, marketing, selling, or enrollment for health care, consumer directed health care, behavioral health, prescription drug, dental, vision, long or short term disability, automobile medical payment, or workers' compensation plans; **Claim Services**; establishing health care provider networks including tiered networks; provision of information with respect to tiered networks and/or consumer directed health care plans, including cost and quality information regarding specific providers, services and/or charges; reviewing the quality of **Medical Services** or providing quality assurance; design and/or implementation of financial incentive plans; design and/or implementation of Pay for Performance Programs; wellness or health promotion education; development or implementation of clinical guidelines, practice parameters or protocols; triage for payment of **Medical Services**; and services or activities performed in the administration or management of health care, consumer directed health care, behavioral health, prescription drug, dental, vision, long or short term disability, automobile medical payment, or workers' compensation plans.

* * *

///

(Z) **"Wrongful Act"** means:

    (1)    any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by any **Insured Person** in his or her capacity as such, or any matter asserted against any **Insured Person** solely by reason of his or her status as such;

    (2)    for the purposes of Insuring Agreement (C) of this Coverage Section, any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the **Organization**;

    (3)    any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by any **Executive** in his or her **Outside Capacity**; or

    (4)    with respect to both **Insured Persons** and the **Organization**, and subject to paragraphs (1), (2) and (3) above, any: ...

         *      *      *

21.    The D&O Coverage Section of the 2015 Policy contains the following relevant exclusions:

**III.**    **EXCLUSIONS**

This Coverage Section does not apply to, and no coverage will be available under this Coverage Section for, **Loss** from any **Claim**:

    (A)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** that, before the Inception Date of this Policy stated in ITEM 2(a) of the Declarations, was the subject of any notice given under any directors and officers liability or other similar management liability policy or coverage section of which this Coverage Section is a direct or indirect renewal or replacement;

\* \* \*

(K)  made against any **Insured** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

    (1)  such **Insured** having gained in fact any profit, remuneration or advantage to which such **Insured** is not legally entitled; or

    (2)  the committing of any deliberately fraudulent or dishonest act or omission, or any willful violation of any statute, rule or law, by such **Insured**;

provided, that this EXCLUSION (K) shall not apply unless the gaining by such **Insured** of such profit, remuneration or advantage to which such **Insured** is not legally entitled, or the deliberately fraudulent or dishonest act or omission or willful violation of statute, rule or law, has been established by a final adjudication of the **Claim** or final adjudication in any judicial or administrative proceeding;

\* \* \*

(O)  for any actual or alleged liability of any **Insured** under any express contract or agreement; provided, that this EXCLUSION (O) shall not apply to liability which would have attached in the absence of such express contract or agreement;

(P)  based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged act, error or omission in the performance of, or failure to perform, **Managed Care Activities** by any **Insured** or by any individual or entity for whose acts, errors or omissions any **Insured** is legally responsible; provided, that this EXCLUSION (P) shall not apply to any **Claim** for an actual or alleged act, error or omission in connection with the performance of, or

1  failure to perform, **Provider Selection** otherwise covered by this

2  Coverage Section.

3         \*     \*     \*

4  22.    Section VIII of the D&O Coverage Section in the 2015 Policy at relevant part states:

5  **VIII.  REPORTING OF CLAIMS AND CIRCUMSTANCES**

6  (A)   If, during the **Policy Period** or any applicable Extended Reporting

7  Period, any **Claim** is first made against an **Insured**, the **Insureds** must,

8  as a condition precedent to any right to coverage under this Coverage

9  Section, give the Underwriter written notice of such **Claim** as soon as

10  practicable after the **Organization's** risk manager or general counsel (or

11  an equivalent position thereof) first becomes aware of such **Claim**, and

12  in no event later than: . . .

13  \* \* \*

14  (D)   All **Related Claims**, whenever made, shall be deemed a single **Claim**

15  made when the earliest of such **Related Claims** was first made, or when

16  the earliest of such **Related Claims** is treated as having been made in

17  accordance with paragraph (B) above, whichever is earlier.

18         \*     \*     \*

19  23.    The term "**Related Claims**" is defined in the **General Terms and Conditions Section**

20  which provides:

21  (Q)   "**Related Claims**" means all **Claims** for **Wrongful Acts** based upon,

22  arising out of, directly or indirectly resulting from, in consequence of,

23  or in any way involving the same or related facts, circumstances,

24  situations, transactions or events or the same or related series of facts,

25  circumstances, situations, transactions or events, whether related

26  logically, causally or in any other way.

\*       \*       \*

## THE 2016-2017 POLICY

24.     Atlantic issued policy No. MCM-01079-16, to FirstChoice with a January 1, 2016 to January 1, 2017 **Policy Period** (the "2016 Policy"). The 2016 Policy has limits of liability of $1,000,000 each **Claim** and in the aggregate. (A copy of the 2016 Policy is attached hereto and incorporated herein at Exhibit 2.)

25.     The 2016 Policy contains substantially the same relevant terms, conditions, limitations and exclusions as the 2015 Policy and thus Atlantic has not set forth them again.

26.     The 2016 Policy contains Endorsement No. 1 (ELECT EXTENDED REPORTING PERIOD ENDORSEMENT), which states as follows in relevant part:

(1)     Solely with respect to the following **Liability Coverage Section(s):**

General Terms and Conditions

the **Named Organization** has elected to purchase the Extended Reporting Period from January 1, 2017 to January 1, 2023 in accordance with Section VIII EXTENDED REPORTING PERIOD of the General Terms and Conditions Section, but such coverage shall apply only to **Claims** for **Wrongful Acts** committed or allegedly committed before January 1, 2017. Accordingly, on and as of January 1, 2017 and solely with respect to the **Liability Coverage Section(s)** listed above:

(a)     Section VIII EXTENDED REPORTING PERIOD of the General Terms and Conditions Section is deleted in its entirety.

(b)     All references in this Policy to an Extended Reporting Period, other than the references made in the INSURING AGREEMENTS and REPORTING OF CLAIMS AND CIRCUMSTANCES sections of the **Liability Coverage Section(s)** listed above, are deleted.

(c)     Section IX CHANGES IN EXPOSURE of the General Terms and Conditions Section is deleted in its entirety.

\*       \*       \*

///
///

1

**FACTUAL BACKGROUND**

2      27.    SmartMed specializes in the development and management of Independent Physician

3  Associations ("IPAs").

4      28.    At all times relevant herein, Matthew Abraham ("Abraham") was the Chief Executive

5  Officer of SmartMed.

6      29.    Abraham consulted with Defendants M. Reddy, K. Reddy and Nareddy for the creation

7  of an IPA that would be FirstChoice.

8      30.    FirstChoice Medical Group was incorporated on or about June 19, 2013.

9      31.    SmartMed and FirstChoice negotiated a Master Services Agreement ("MSA") that

10  became effective on or about August 1, 2013.

11      32.    The MSA included a provision for management fees to SmartMed in which FirstChoice

12  was to pay $11,000 per month commencing on September 1, 2013.

13      33.    Pursuant to the MSA, once FirstChoice's members reached 500 "covered lives," it

14  would be required to pay SmartMed 12% of its revenue each month, along with a yearly performance

15  bonus of 30% of all surpluses from the hospital pool, physician pool and any bonuses FirstChoice was

16  paid  from any third-parties.

17      34.    On December 13, 2013, FirstChoice terminated and/or rescinded the MSA.

18      35.    On or about February 27, 2014, SmartMed filed its Demand for Arbitration (the "2014

19  SmartMed Arbitration") against FirstChoice which was required by the MSA, and which was amended

20  on May 29, 2015 to add certain individual physicians of FirstChoice.

21      36.    On or about September 15, 2016, the assets of FirstChoice were sold to Vantage

22  Medical Group, Inc. ("Vantage").

23      37.    A Final Arbitration Award, awarding $2,224,105.27 in favor of SmartMed and against

24  FirstChoice, was rendered on or about February 21, 2017.

25      38.    As a result of the FirstChoice asset sale, SmartMed was unable to collect against

26  FirstChoice.

27  ///

28  ///

COMPLAINT FOR DECLARATORY JUDGMENT

39.    On or about October 31, 2017, SmartMed filed suit against the FirstChoice Defendants in order to collect the judgment awarded in its favor and against FirstChoice in the Arbitration (the "2017 SmartMed Lawsuit").

### THE 2014 SMARTMED ARBITRATION

40.    SmartMed's initial Demand for Arbitration sought a declaration that the MSA be reinstated and in full effect or alternatively as follows:

(1)    damages in an amount according to proof including, but not limited to, expenses incurred in the start-up phase of the MSA and monies due under the MSA including lost profits;

(2)    exemplary damages in an amount according to proof;

(3)    arbitration expenses; and

(4)    costs, including attorney's fees.

(A copy of the Demand for Arbitration is attached hereto and incorporated herein at Exhibit 3.)

41.    On or about May 29, 2015, SmartMed filed its Amended Demand for Arbitration against FirstChoice and added Defendants M. Reddy, K. Reddy, Nareddy, Bautista, Janda, Tagore, Narala and Khaira.   (A copy of the Amended Demand for Arbitration is attached hereto and incorporated herein at Exhibit 4.)

42.    The First Claim of the Amended Demand alleged that FirstChoice breached its contract with SmartMed by "unilaterally purporting to terminate and/or rescind the MSA and by failing and refusing to perform and/or comply with the terms thereof . . . ." (Id. at ¶ 4.)

43.    The Second Claim of the Amended Demand for Arbitration alleged fraud, intentional misrepresentation, promise without intent to perform and deceit against all of the FirstChoice Defendants.

44.    The Second Claim of the Amended Demand for Arbitration alleged that FirstChoice and those acting on its behalf, "made oral and written false and fraudulent representations and concealed material facts and their true intentions, including the false and deceitful representations in the covenants, promises and provisions of the MSA [as] well as in other statements and writings to Abraham . . . on behalf of . . . MedSmart . . . ." (Id. at ¶ 10.)

1      45.     The Second Claim was dismissed as to the individual FirstChoice Defendants because

2   they were not parties to the arbitration clause in the MSA.

3      46.     On or about February 21, 2017, a Final Arbitration Award was entered in favor of

4   SmartMed and awarded damages in the amount of $2,224,105.27.  (A copy of the Final Arbitration

5   Award is attached hereto and incorporated herein at Exhibit 5.)

6      47.     The Final Arbitration Award stated as follows: "All of the costs and expenses spent to

7   establish the FirstChoice IPA had been paid by Abraham and MedSmart.  FirstChoice spent no money

8   and refused to pay marketing expenses that were identified in the MSA . . ..  FirstChoice was given at

9   no cost a functional IPA that was able to generate tens of millions of dollars in revenue over the next

10   three years."  (Id. p. 7.)

11      48.     The Arbitrator stated that he could not award damages sustained by SmartMed from

12   September 2016 through August 2020 (the end of the MSA term) because the FirstChoice entity

13   "ceased to be a viable entity after the asset sale and did not receive any further capitalization payments

14   upon which SmartMed was entitled to payment."  (Id. p. 9.)

15      49.     As a result of the FirstChoice asset sale, the Arbitrator concluded that because

16   FirstChoice was no longer doing business, SmartMed was not entitled to return to the initial $11,000

17   per month base monthly payment.  (Id.)

18      50.     The Arbitrator also concluded that he was without authority to order the attachment of

19   funds reserved to pay legal expenses and held by FirstChoice to satisfy the Award and thus denied

20   SmartMed's request in this regard.  (Id.)

21      51.     The Arbitrator also denied SmartMed's request for additional discovery with respect to

22   the asset sale on the ground that it did not have jurisdiction over Vantage.

23      52.     On or about January 11, 2018, the Superior Court of Fresno County, California issued

24   a judgment confirming the Arbitration Award in the amount of $2,224,105.27, plus interest at 10%

25   and costs (the "Judgment"). (A copy of the Judgment is attached hereto and incorporated herein at

26   Exhibit 6.)

27      53.     The Judgment is broken down as follows:

28   ///

- $44,000.00 for monthly payments not made from November 2013 through February 2014;
- $827,560.00 for net lost profits payable under the MSA from March 2014 through August 2016;
- $325,000.00 for lost investment of time and expenses incurred in the formation of the FirstChoice IPA; and
- $1,027,545.27 for SmartMed's costs and legal fees incurred in the arbitration as the prevailing party.

54.     FirstChoice tendered the Amended Demand for Arbitration as well as the Final Arbitration Award and Atlantic denied both tenders.

## THE 2017 SMARTMED LAWSUIT

55.     On October 31, 2017, SmartMed filed its initial Complaint against the FirstChoice Defendants and Vantage, which was amended.

56.     SmartMed's Second Amended Complaint (the "SAC"), filed on July 31, 2018, alleges counts for fraudulent transfer, constructive fraudulent transfer and de-facto merger- successor-in-interest liability.  (A copy of the Second Amended Complaint, without exhibits, is attached hereto and incorporated herein at Exhibit 7.)

57.     The SAC at Paragraph No. 1 seeks "damages arising out of the fraudulent sale and purchase of substantially all of FirstChoice's assets to Vantage which was orchestrated by and among each and all of said Defendants, to avoid the liability (and now Judgment) owed to SmartMed by FirstChoice as a result of FirstChoice's breach of contract, the Management Services Agreement ("MSA"), entered into as between FirstChoice and SmartMed, as well as future liability thereunder."

58.     The SAC at Paragraph No. 27 alleges that "[j]ust four months after the execution of the MSA, FirstChoice breached the MSA by unlawfully claiming to terminate SmartMed's consulting agreement, and SmartMed was forced to pursue it rights through binding arbitration."

59.     The SAC at Paragraph No. 27 further alleges that "SmartMed sought to add the Individual Doctors as Respondents in the arbitration, but was denied without prejudice on the grounds they were not parties to the arbitration clause in the MSA and would, therefore, need to be sued in State Court as they now have been here."

///

60.     The SAC at Paragraph Nos. 27 and 28 alleges that the arbitration included more than three years of discovery and pretrial practice and concluded in 13 days of arbitration resulting in a Final Award issued on or about February 21, 2017 which entitled SmartMed to recover a sum of $2,224,105.27.

61.     The SAC at Paragraph Nos. 30 and 31 alleges that after the Final Award was issued, FirstChoice filed a Petition to Vacate the Final Award, which was denied by the Superior Court of Fresno County.  In turn, SmartMed filed a petition to confirm the Final Award, which was granted on or about May 23, 2017, and the Court entered final judgment against FirstChoice on January 11, 2018 in the amount of $2,224,105.27.

62.     The SAC alleges that FirstChoice has not paid any part of the Judgment.

63.     The SAC at Paragraph Nos. 32-35 alleges as follows:

32.     In the midst of and just days before the arbitration was to conclude, in September of 2016, Mr. Abraham learned through his contacts in the healthcare community that FirstChoice, through the Individual Doctors, either had, or intended to, wind down, close, sell, liquidate, or engage in some other corporate transaction intended to shield FirstChoice assets from arbitration award in SmartMed's favor and to make it judgment-proof. This followed specific sworn denials—under oath—by FirstChoice's President, Dr. Bautista, and FirstChoice's Secretary, Dr. K. Reddy, that any such sale was being contemplated or in the works. FirstChoice had further specifically denied to the Arbitrator, in response to his inquiries, that any such sale or disposition was being contemplated or in the works. Such denials were willfully or recklessly false and perjured.

33.     In the arbitration session that followed, counsel for SmartMed obtained sworn testimony from Dr. Nareddy (FirstChoice's Treasurer) that indeed FirstChoice, through the Individual Doctors, had sold all or substantially all FirstChoice assets and liabilities to Vantage. SmartMed is informed and believes that on or about September 15, 2016, FirstChoice and its shareholders (the Individual Doctors) transferred significant assets and liabilities to Vantage by way of executing an Asset Purchase

Agreement ("APA"). On information and belief, such sale was specifically in anticipation of an arbitration award against FirstChoice.

34.    Consistent with the aforementioned information and belief, the FirstChoice-to-Vantage APA specifically excluded the liability arising out of FirstChoice's contractual obligations to SmartMed and any resulting arbitration award against FirstChoice, even though the APA made provision for every other material expense, including anticipated future legal expenses of FirstChoice in conducting the arbitration (and post-arbitration) proceedings. Dr. Nareddy testified that the Individual Doctors "had no choice" but to sell the FirstChoice assets due to the mounting liability resulting from SmartMed's pursuit of its rights under the breached MSA. Believing that the Individual Doctors had outfoxed SmartMed's efforts to recover on its breach of contract claim, Dr. Nareddy taunted Mr. Abraham, testifying that all that remained of FirstChoice was "ashes." This pre-judgment sale was a fraudulent transfer in a clear attempt to avoid having to satisfy the Final Award . . ..

35.    Despite Dr. Nareddy's testimony, FirstChoice had actively concealed the true nature of its plans to sell. Specifically, Dr. Bautista (FirstChoice's President) testified during the arbitration proceeding that he was unaware of any plans or negotiations to sell FirstChoice (and, implicitly, large swaths of its assets). Dr. K. Reddy (FirstChoice's Secretary) similarly testified, claiming she had no role in the sale of FirstChoice or its assets. Had FirstChoice been initially forthright during the arbitration about possibly selling some or all of its assets, SmartMed could have (and very likely would have) sought to enjoin such a transparently fraudulent transfer. Instead, FirstChoice withheld that information until the very last end—disclosing the APA only days before the arbitration concluded.

64.    The SAC at Paragraph No. 40 alleges that the FirstChoice Defendants and Vantage "maliciously concocted a transaction that fraudulently striped FirstChoice of any operations, capital, equity, value, capitalization, and assets, and transferred them to Vantage in order for the Individual Doctors to continue carrying on business and generating revenue as an IPA without being forced to

1   honor the legal obligations FirstChoice had contracted for, and which FirstChoice had received the
2   benefit of the bargain."

3   65.     The SAC at Paragraph No. 43 alleges in part that the "fraudulent transfer of the APA
4   was made during the pendency of a lawsuit/arbitration that established the debtor-creditor relationship
5   between SmartMed and FirstChoice" and that the "underlying arbitration concluded on September 20,
6   2016, but the APA was dated just five (5) days prior – September 15, 2016."

7   66.     In sum, SmartMed filed its lawsuit for the purpose of collecting the Final
8   Award/Judgment entered in its favor in the Arbitration and punitive damages based the alleged
9   fraudulent, malicious and deceitful conduct of the FirstChoice Defendants.

10  67.     On November 13, 2017, FirstChoice tendered the 2017 SmartMed Lawsuit to Atlantic
11  during the Extended Reporting Period of the 2016 Policy.

12  68.     Atlantic initially agreed to provide a defense to FirstChoice for the 2017 SmartMed
13  Lawsuit pursuant to a reservation of rights asserting several grounds including that the lawsuit was
14  related to the 2014 SmartMed Arbitration and requested that SmartMed provide a copy of the initial
15  Demand for Arbitration.

16  69.     After initially reserving its rights, Atlantic advised the FirstChoice Defendants of its
17  determination that there is no coverage and asked, on more than one occasion, that the tender of defense
18  of the SmartMed Lawsuit be withdrawn.  Atlantic continued to defend the SmartMed Lawsuit while
19  waiting for the FirstChoice Defendants' response.  After several months, rather than withdraw the
20  tender of defense, the FirstChoice Defendants demanded that Atlantic continue defending the
21  SmartMed Lawsuit.

22  70.     In February 2019, FirstChoice provided a copy of the initial Demand for Arbitration.

23  71.     Atlantic has filed the instant lawsuit to seek a declaration that neither the
24  2014 SmartMed Arbitration nor the 2017 SmartMed Lawsuit constitute a claim first made under the
25  Atlantic Policies issued to FirstChoice and, thus, Atlantic is entitled to withdraw from the FirstChoice
26  Defendants' defense and recoup the monies it has expended defending the FirstChoice Defendants.

27  ///
28  ///

## COUNT I – DECLARATORY JUDGMENT

### (The 2015 Policy)

72.     Atlantic incorporates by reference the allegations of Paragraphs 1 through 71 above as though fully set forth herein.

73.     The 2015 Policy is the first policy Atlantic issued to FirstChoice.

74.     The **Policy Period** for the 2015 Policy is January 1, 2015 to January 1, 2016.

75.     The 2014 SmartMed Arbitration was first made against FirstChoice on or about February 27, 2014, which is prior to the January 1, 2015 inception date of the 2015 Policy.

76.     On information and belief, FirstChoice provided notice of the February 27, 2014 Demand for Arbitration in the 2014 SmartMed Arbitration to another insurer.

77.     The 2017 SmartMed Lawsuit was filed against FirstChoice on October 31, 2017, which is after the January 1, 2016 expiration date of the 2015 Policy.

78.     Insuring Agreement (C) of the Directors, Officers & Organization Liability Coverage Section of the 2015 Policy states that the "Underwriters will pay, on behalf of the **Organization**, **Loss** from any **Claim** first made against the **Organization** during the **Policy Period** or applicable Extended Reporting Period . . . ."

79.     There is no coverage for the 2014 SmartMed Arbitration because it is not a **Claim** first made against FirstChoice during the **Policy Period** of the 2015 Policy as required.  Consequently, there is no coverage available for the Final Arbitration Award at issue in the 2017 SmartMed Lawsuit.

80.     In addition, Exclusion (A) of the Directors, Officers & Organization Liability Coverage Section in the 2015 Policy precludes coverage for **Loss** from any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act** that, before the Inception Date of this Policy stated in ITEM 2(a) of the Declarations, was the subject of any notice given under any directors and officers liability or other similar management liability policy or coverage section of which this Coverage Section is a direct or indirect renewal or replacement.

81.     Coverage is precluded under the 2015 Policy based on the doctrines of fortuity, known loss and/or loss in progress.

82.     To the extent any of the FirstChoice Defendants gave notice of the 2014 SmartMed Arbitration to another carrier before the January 1, 2015 inception date of the 2015 Policy, there is no coverage.

**WHEREFORE**, Plaintiff, ATLANTIC SPECIALTY INSURANCE COMPANY, prays for judgment as follows:

(A)     Declaring that the 2014 SmartMed Arbitration was a claim first made prior to the inception of the Atlantic Policies and that Atlantic has no duty to defend or indemnify SmartMed with regard to the 2014 SmartMed Arbitration and, specifically, for the Final Arbitration Award;

(B)     Declaring that the 2017 SmartMed Lawsuit is a Related Claim to the 2014 SmartMed Arbitration, and that Atlantic has no duty to defend or indemnify the FirstChoice Defendants for the 2017 SmartMed Lawsuit;

(C)     Alternatively, declaring that Atlantic otherwise has no duty to defend or indemnify any of the FirstChoice Defendants under the 2015 Policy pursuant to the terms and exclusions set forth above;

(D)     Alternatively, declaring that Atlantic otherwise has no duty to defend or indemnify any of the FirstChoice Defendants under the 2016 Policy pursuant to the terms and exclusions set forth above;

(E)     Alternatively, declaring that Atlantic has no obligation to pay punitive or exemplary damages; and

(F)     Awarding Atlantic such other and further relief as the Court may deem appropriate and just.

## COUNT II – DECLARATORY JUDGMENT

### (The 2016 Policy)

83.     Atlantic incorporates by reference the allegations of Paragraphs 1 through 71 above as though fully set forth herein.

///

///

84.   On October 31, 2017, SmartMed filed its lawsuit under a new theory to collect the Final Arbitration Award from FirstChoice and/or its prior owners and/or its alleged successor-in-interest who it could not join in the 2014 SmartMed Arbitration.

85.   FirstChoice reported the 2017 SmartMed Lawsuit to Atlantic under the Extended Reporting Period of the 2016 Policy, which has a January 1, 2016 to January 1, 2017 **Policy Period**, and a January 1, 2017 to January 1, 2023 Extended Reporting Period.

86.   The 2014 SmartMed Arbitration was first made against FirstChoice on or about February 27, 2014, which is prior to the January 1, 2016 inception date of the 2016 Policy.

87.   On information and belief, FirstChoice provided notice of the February 27, 2014 Demand for Arbitration in the 2014 SmartMed Arbitration to another insurer.

88.   The 2017 SmartMed Lawsuit was filed against FirstChoice on October 31, 2017, which is during the Extended Reporting Period of the 2016 Policy.

89.   Insuring Agreement (C) of the Directors, Officers & Organization Liability Coverage Section of the 2016 Policy states that the "Underwriters will pay, on behalf of the **Organization, Loss** from any **Claim** first made against the **Organization** during the **Policy Period** or applicable Extended Reporting Period . . . ."

90.   There is no coverage for the 2014 SmartMed Arbitration under the 2016 Policy because the 2014 SmartMed Arbitration did not arise out of a **Claim** first made against FirstChoice during the January 1, 2016 to January 1, 2017 **Policy Period** of the 2016 Policy as required.  Consequently, there is no coverage available for the Final Arbitration Award at issue in the 2017 SmartMed Lawsuit.

91.   The 2016 Policy states that "[a]ll **Related Claims**, whenever made, shall be deemed a single Claim made when the earliest of such **Related Claims** was first made . . . ."

92.   The 2016 Policy defines "**Related Claims**" as "all **Claims** for **Wrongful Acts** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events, whether related logically, causally or in any other way."

///

93. The 2017 SmartMed Lawsuit relates both logically and causally to the 2014 SmartMed Arbitration.

94. Additionally, the 2017 SmartMed Lawsuit would not have been filed but for FirstChoice's failure to pay the Final Arbitration Award to SmartMed.

95. The 2017 SmartMed Lawsuit is based upon, arises out of, directly or indirectly results from, and is a consequence of the 2014 SmartMed Arbitration, specifically it is an attempt to recover the Final Arbitration Award, and thus constitutes a **"Related Claim"** deemed a single claim (the SmartMed Claim) made when the earliest claim, *i.e.*, on or about February 27, 2014 when SmartMed filed the Demand for Arbitration.

96. Because the 2017 SmartMed Lawsuit is a **"Related Claim"** to the 2014 SmartMed Arbitration, which is uncovered by either the 2015 Policy or the 2016 Policy because it was made before the **Policy Period** of either policy, Atlantic has no duty to defend or indemnify the FirstChoice Defendants.

97. Alternatively, Atlantic has no obligation to defend or indemnify the FirstChoice Defendants for the SmartMed Lawsuit to the extent that the SmartMed Lawsuit does not allege that one or more of the FirstChoice Defendants committed a **"Wrongful Act"** as defined by the Policies.

98. Alternatively, Atlantic has no obligation to defend or indemnify the FirstChoice Defendants for the SmartMed Lawsuit to the extent that the SmartMed Lawsuit does not allege a covered **"Loss"** as defined by the Policies.

99. Alternatively, Atlantic has no obligation to indemnify the FirstChoice Defendants for the SmartMed Lawsuit based on the application of Exclusion (K) of the Directors, Officers & Organization Liability Coverage Section in the 2016 Policy, which precludes indemnity coverage for **Loss** from any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

        (1)    such **Insured** having gained in fact any profit, remuneration or advantage to which such **Insured** is not legally entitled; or

        (2)    the committing of any deliberately fraudulent or dishonest act or omission, or any willful violation of any statute, rule or law, by such **Insured**; ...

100. Alternatively, Atlantic has no obligation to indemnify the FirstChoice Defendants for the SmartMed Lawsuit based on the application of Exclusion (O) of the Directors, Officers & Organization Liability Coverage Section in the 2016 Policy, which precludes indemnity coverage for **Loss** from any **Claim** for any actual or alleged liability of any **Insured** under any express contract or agreement; provided, that this EXCLUSION (O) shall not apply to liability which would have attached in the absence of such express contract or agreement;

101. Alternatively, Atlantic has no obligation to indemnify the FirstChoice Defendants for the SmartMed Lawsuit based on the application of Exclusion (P) of the Directors, Officers & Organization Liability Coverage Section in the 2016 Policy, which precludes indemnity coverage for **Loss** from any **Claim** "based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged act, error or omission in the performance of, or failure to perform, **Managed Care Activities** by any **Insured** or by any individual or entity for whose acts, errors or omissions any **Insured** is legally responsible; . . . ."

102. Alternatively, Atlantic has no obligation to pay any amount of punitive or exemplary damages assessed against the FirstChoice Defendants.

103. Additionally, coverage is precluded under the 2016 Policy based on the doctrines of fortuity, known loss and/or loss in progress.

104. Atlantic's investigation is ongoing, and it reserves the right to raise any and all additional defenses to coverage as are warranted by the facts and the law.

**WHEREFORE**, Plaintiff, ATLANTIC SPECIALTY INSURANCE COMPANY, prays for judgment as follows:

(A) Declaring that the 2014 SmartMed Arbitration was a claim first made prior to the inception of the Atlantic Policies and that Atlantic has no duty to defend or indemnify SmartMed with regard to the 2014 SmartMed Arbitration and, specifically, for the Final Arbitration Award;

(B) Declaring that the 2017 SmartMed Lawsuit is a Related Claim to the 2014 SmartMed Arbitration, and that Atlantic has no duty to defend or indemnify the FirstChoice Defendants for the 2017 SmartMed Lawsuit;

(C)   Alternatively, declaring that Atlantic otherwise has no duty to defend or indemnify any of the FirstChoice Defendants under the 2015 Policy pursuant to the terms and exclusions set forth above;

(D)   Alternatively, declaring that Atlantic otherwise has no duty to defend or indemnify any of the FirstChoice Defendants under the 2016 Policy pursuant to the terms and exclusions set forth above;

(E)   Alternatively, declaring that Atlantic has no obligation to pay punitive or exemplary damages; and

(F)   Awarding Atlantic such other and further relief as the Court may deem appropriate and just.

## COUNT III – DECLARATORY JUDGMENT

### (Reimbursement Of Defense Costs)

105.   Atlantic incorporates by reference the allegations of Paragraphs 1 through 71 above as though fully set forth herein.

106.   Pursuant to reservation of rights, Atlantic has paid and continues to pay for the defense of the FirstChoice Defendants against the SmartMed Lawsuit under the 2016 Policy.

107.   For the reasons stated herein, there is no coverage for any defense fees or costs paid by Atlantic for the defense of the FirstChoice Defendants against the SmartMed Lawsuit under the 2016 Policy.

108.   Atlantic has no duty to pay defense or indemnity for any claim that is not covered under the Atlantic Policies and accordingly, Atlantic is entitled to reimbursement from the FirstChoice Defendants jointly and severally for all amounts paid for the defense of the FirstChoice Defendants against the SmartMed Lawsuit.

**WHEREFORE,** Plaintiff, ATLANTIC SPECIALTY INSURANCE COMPANY, prays for judgement as follows:

(A)   Declaring that Atlantic has no duty or obligation to pay defense fees or costs on behalf of the FirstChoice Defendants with respect to the SmartMed Lawsuit;

///

1       (B)    Declaring that FirstChoice must reimburse Atlantic for the monies paid for the

2             defense of the FirstChoice Defendants, including any accruing amounts of

3             defense fees and/or costs and applicable interest on thereon on the total amount

4             paid by Atlantic; and

5       (C)    Awarding Atlantic such other and further relief as the Court may deem

6             appropriate and just.

7 Dated: December 23, 2019

8                       Respectfully submitted,

10                       ATLANTIC SPECIALTY INSURANCE

11                       COMPANY

13                       By:

14                           Theodore W. Hoppe

16 Theodore Hoppe
**HOPPE LAW GROUP**
17 680 W. Shaw Avenue, Suite 207
Fresno, CA 93704
18 Telephone:   (559) 241-7070
Facsimile:    (559) 241-7212
19 tad@hoppe-law.com

20 -and-
21

22
*Pro Hac Vice* Pending:Roderick T. Dunne
23
Linda J. Carwile
24 **KARBAL, COHEN, ECONOMOU, SILK & DUNNE, LLC**
25 150 S. Wacker Drive, Suite 1700
Chicago, IL 60606
26 Telephone:   (312) 431-3700
Facsimile:    (312) 431-3670
27 rdunne@karballaw.com
lcarwile@karballaw.com
28

COMPLAINT FOR DECLARATORY JUDGMENT